**In re ALMAC'S, INC., Debtor.**

**Bankruptcy No. 93–12090.**

United States Bankruptcy Court,
D. Rhode Island.

April 28, 1994.

Edward J. Bertozzi, Jr., Edwards & Angell, Providence, RI, Robert Lapowsky, Cohen, Shapiro, Polisher, Shiekman and Cohen, Philadelphia, PA, for debtor.

Robert B. Berkelhammer, Licht & Semonoff, Providence, RI, for Wetterau Prop., Inc. and University Heights Associates.

Diane Finkle, Winograd, Shine & Zacks, P.C., Providence, RI, for Wetterau, NE, Inc.

John F. Drew, Lane & Altman, Boston, MA, for Ekim Co., L.P.

John J. Clorite, Managing Partner, Clorite & Clorite, Somerset, MA.

Bruce W. Gladstone, Cameron & Mittleman, Providence, RI, for G.E. Capital Corp.

Sheryl Serreze, Providence, RI, Office of U.S. Trustee.

### MEMORANDUM OF DECISION ON ORDER REQUIRING PAYMENT OF POST–PETITION TAXES

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

On March 18, 1994, we issued an Order requiring the Debtor to pay all outstanding post-petition taxes on nonresidential leases within twenty-one days, failing which such leases would be deemed rejected. Said Order was made in response to the motions of several lessors seeking the payment of post-petition lease obligations pursuant to 11 U.S.C. § 365(d)(3).[1] Because of the need for an expedited resolution of said motions, our March 18 Order was quite abbreviated. This Memorandum sets forth in more detail the findings and conclusions in support of our March 18, 1994 Order.

### BACKGROUND

The Debtor operates a major supermarket chain which filed for Chapter 11 protection on August 6, 1993. Since that time, it has, *inter alia*, been evaluating the profitability of its (originally) forty odd stores, and downsizing operations in an attempt to successfully reorganize under Chapter 11. Part of this effort has included rejecting various nonresidential real estate leases which the Debtor has determined to be unproductive on a going forward basis.

In addition, the Debtor received permission to extend the time within which to assume or reject its nonresidential leases. *See* 11 U.S.C. § 365(d)(4). During this period of indecision, however, several lessors have requested orders requiring the Debtor to timely perform all of its post-petition lease obligations in accordance with the directives of 11 U.S.C. § 365(d)(3). The Debtor has agreed to make all of the base rental payments due under its unassumed leases, but objects to paying any post-petition taxes on the ground that "it is far from guaranteed at this date that Almac's will be able to pay in full such administrative claims."[2] (Almac's Obj. Mot. Wetterau Properties at 7.)

A secondary issue is whether the calculation of post-petition tax obligations should be

---

1. The lessors whose motions are before the Court include: (1) Wetterau Properties, Inc.; (2) University Heights Associates; (3) Ekim Company, L.P.; and (4) Clorite & Clorite.

2. The gravity of this admission cannot be overlooked and raises serious concern as to the ability of the Debtor to reorganize. This Court has previously expressed its unwillingness to prolong a case largely for the benefit of the professionals, where there is a continuing and escalating inability to satisfy post-petition administrative expenses.

**6**

on an accrual (pro rated) or billing date basis. The Debtor contends that the majority view endorses the accrual basis, while the landlords argue in favor of "those payments which became due" after the order for relief was entered. There is further disagreement as to whether the acceleration clause contained in most of the leases is enforceable against Almac's, in which case the landlords request that Almac's be ordered to pay the full year's taxes in one payment (instead of in the customary quarterly installments).

Finally, there are a number of leases which have recently been rejected, but where the Debtor did not comply with § 365(d)(3) regarding rental and tax payments due under the (then unrejected) leases. The issue as to these, is whether as administrative expense creditors, the lessors are entitled to payment *now*, or whether such payments may be deferred until the end of the case, when the total extent of administrative expenses will be known, along with the ability of the Debtor to satisfy them.

### DISCUSSION

#### 1. *Timing of the Payment*

The starting point for our discussion is 11 U.S.C. § 365(d)(3), which provides in relevant part:

> The trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, *but the time for performance shall not be extended beyond such 60–day period.*

11 U.S.C. § 365(d)(3) (emphasis added).

■ This subsection contains no express penalty or remedy provision for noncompliance. *See, e.g., In re Granada,* 88 B.R. 369, 373 (Bankr.D.Utah 1988). It is also clear,

however, that this Court lacks discretion to extend the Debtor's obligation to perform under the lease beyond the initial 60 day period.[3] The wording of the statute is clear and needs no interpretation. *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Therefore, the question becomes, what happens when a Debtor fails to comply with the mandate of § 365(d)(3)? The Debtor argues that the Court has the authority to defer payment of these administrative expenses (which presumably could even include the Debtor's obligation to pay the monthly base rent) in cases where the Debtor might be administratively insolvent, relying on *In re Appliance Store, Inc.,* 148 B.R. 234 (Bankr.W.D.Pa.1992); *In re Orvco, Inc.,* 95 B.R. 724 (9th Cir. BAP 1989); *In re United West, Inc.,* 87 B.R. 138 (Bankr.D.Nev.1988); and *In re Granada, Inc.,* 88 B.R. 369 (Bankr.D.Utah 1988).

Upon review and consideration of these authorities, many of which are not entirely inapposite to our holding herein, we cannot agree that the Court may ignore the specific command of § 365(d)(3), or the specific lease provisions regarding rent and taxes during this period of limbo created by the Debtor's own indecision. As has been often quoted:

> In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor.
>
> The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property *at the time required in the lease.* This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

---

**3.** Although the Debtor does not dispute the plain meaning of the highlighted language, it bases its argument on case law which suggests that "the timing of the payment of such administrative

claims is within the discretion of the bankruptcy court." (Debtor's Mem.Opp'n Mot. Wetterau at 7).

130 Cong.Rec. S8994–95 (daily ed. June 29, 1984) (remarks of Senator Hatch), quoted in *In re Granada, Inc.*, 88 B.R. 369, 371 (Bankr. D.Utah 1988) (emphasis added).

Many of the cases relied upon by the Debtor deal with requests for payment under § 365(d)(3) *after rejection,* and/or after the trustee has vacated the premises. *See In re Orvco,* 95 B.R. at 728 ("In the absence of such language [superpriority], we hold that *after rejection of the lease,* the payment of an administrative claim for rent, like all other administrative claims is within the sound discretion of the bankruptcy court and should be determined under section 503.") (emphasis added); *In re United West, Inc.,* 87 B.R. 138 (Bankr.D.Nev.1988); *In re Granada, Inc.,* 88 B.R. 369, 372 ("In the normal case, the trustee remains in possession of the property and it is clear that the landlord is entitled to immediate payment of the rent reserved in the lease. However, in this case, the debtor did not make the lease payments during the 60 day period [the lease was deemed rejected by operation of law 60 days after filing], [and] the trustee vacated the premises.") Each of these cases, however, either expressly or implicitly recognizes that, consistent with the comments in the legislative history and set forth above, § 365(d)(3) was established to guarantee that landlords receive current lease payments for current services, pending the Debtor's decision to assume or reject its nonresidential leases. In fact, *In re Orvco* specifically noted that "[u]nder this section, a bankruptcy court has the discretion to order the immediate surrender of the leased premises if a debtor fails to make the required payments." 95 B.R. at 727.

In *Child World, Inc. v. Campbell/Massachusetts Trust (In re Child World, Inc.),* 161 B.R. 571 (S.D.N.Y.1993), relied upon by the Debtor for other purposes, the Court held that, although bankruptcy courts have broad discretion over the timing of payment of administrative expenses, "[s]ection 365(d)(3) created an explicit exception to the existing procedures for determining administrative expenses under § 503(b)(1)," and then similarly referred to the legislative history quoted above to the effect that landlords should receive current payment for providing current services to avoid forcing them into the position of involuntary post-petition creditors. *Id.* at 575.

The Debtor correctly points out however, that some courts read into § 365(d)(3) a "substantial doubt of full payment" or "good cause for nonpayment" test on the theory that, otherwise landlords might be receiving a superpriority over other administrative claimants if ultimately there are insufficient funds to pay all administrative claims in full. *See In re Granada, Inc.,* 88 B.R. at 375; *In re Orvco,* 95 B.R. 724.

The problem with this argument is twofold. For one, the statute contains no such discretionary language, and neither does the legislative history support that approach. Secondly, lessors of real estate, unlike post-petition creditors, do not have the choice of whether to provide the Debtor with post-petition services. For example, if a professional hired by the Estate is concerned about receiving full payment for administrative services, such professional can move to withdraw from the case or, in some instances, simply refuse to perform any further service, thereby cutting its losses. Likewise, trade creditors can refuse to do business with the Debtor except upon C.O.D. The landlords have no such option. They are forced into providing services, while being put at risk as to the success of the reorganization. We believe this is precisely the predicament Congress sought to avoid by enacting § 365(d)(3).

■ Accordingly, we reject the Debtor's argument that possible administrative insolvency may excuse it from complying with the clear directive of § 365(d)(3), which is to pay such lease obligations, including tax liabilities as they accrue.

We do not rule however, that lessors should receive a superpriority payment. Rather, we agree with the Court in *In re Granada, Inc.,* that:

The immediate payment of the lessor's claim did not constitute a superpriority, and that such payment was subject to the trustee's right to seek recovery of all or part of the payment in the event that there

are insufficient funds to pay all other administrative expense claimants in full. 88 B.R. at 372 (citing *In re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969, 973 (Bankr.E.D.Pa.1987)).

Accordingly, based upon the above rulings, and consistent with our Order of March 18, 1994, the Debtor is ordered to cure all post-petition lease obligations, including the payment of real estate taxes, on *all leases*,[4] within twenty-one days of March 18, 1994. Failure to do so will result in the automatic rejection of any lease in default under § 365(d)(3).

### 2. *Accrual Versus Billing Date Calculation*

■ We next address the appropriate formula for determining when a tax obligation arises, for purposes of payment under § 365(d)(3). Upon consideration, we adopt the view set forth in *In re Child World*, 161 B.R. 571, that "[t]he legislative history makes clear that Congress did not intend for courts applying § 365(d)(3) to rely mechanically on the billing date in determining which postpetition, prerejection obligations under nonresidential leases must be timely paid." 161 B.R. at 575–576. Thus, we join with the "substantial majority of the courts" which hold that "rent should be prorated to cover only the post-petition, prerejection period, regardless of the fortuity of the billing date." *In re Child World*, 161 B.R. at 575 (citing *In re Ames Dep't Stores, Inc.*, 150 B.R. 107 (Bankr.S.D.N.Y.1993); *In re RB Furniture, Inc.*, 141 B.R. 706, 712 (Bankr.C.D.Cal.1992) ("Debtor was not free to pay the prepetition part of the tax without violating the statutory distribution scheme in the Code."); *In re Ames Dep't Stores, Inc.*, 136 B.R. 353 (Bankr.S.D.N.Y.1992)) (other citations omitted).

Leaving no stones unturned, the parties also disagree on whether the calculation un-

der the accrual method should be made on a calendar year or fiscal year. Based on the assessment period utilized in the State of Rhode Island, we think it appropriate to figure the accrual on a fiscal year. However, we reject the Debtor's suggestion that it should only be required to pay 1/365th of the annual assessment on a daily basis. Instead, we believe the Debtor's obligation to pay real estate taxes should be on a monthly basis (as with the base rent), under the accrual, fiscal year, formula.

### 3. *Acceleration of Real Estate Taxes*

■ On the issue of acceleration of taxes caused by Almac's bankruptcy filing, we agree with the Debtor that to require the payment of the full year's taxes in order to avoid acceleration, would violate the Bankruptcy Code's statutory distribution scheme, as well as the spirit of equality among creditors. Accordingly, we will not enforce such a provision at this time, and adopt the Debtor's recommendation that upon assumption of any such lease, all defaults, including prepetition tax obligations, will be cured.

### 4. *Administrative Status of Rejected Leases*

■ Lastly, we consider the Debtor's obligation under § 365(d)(3) to pay post-petition rent and taxes on the leases already rejected.[5] Again, the language of the statute is clear. Section 365(d)(3) requires the timely payment of all lease obligations on nonresidential leases until the decision to assume or reject the lease is made. Once the lease is rejected, the lessor's rights under § 365(d)(3) cease, and are replaced by the right under § 503(b)(1) to seek an administrative expense claim for services provided during the post-petition, prerejection period.[6] *See In re Granada, Inc.*, 88 B.R. at 372, n. 4 ("By the express language of the statute, § 365(d)(3) only applies 'until [a nonresidential real prop-

---

**4.** On April 11, 1994, at the Debtor's request, we issued a clarification order stating that it was the intent of our March 18, 1994 Order that it cover *all* nonresidential real estate leases which have yet to be either assumed or rejected by the Debtor, regardless of whether a landlord has moved for an order of compliance under 11 U.S.C. § 365(d)(3).

**5.** This is different from *In re Narragansett Clothing Co.*, 119 B.R. 388 (Bankr.D.R.I.1990),

*amended* 122 B.R. 855 (Bankr.D.R.I.1990), where, *prior to* the rejection of the subject leases, the Lessors sought and obtained orders requiring the immediate payment of rent under § 365(d)(3).

**6.** Upon rejection, a landlord's rights against the estate are controlled by § 502(g), which treat such breach of contract claims as arising prepetition.

erty] lease is assumed or rejected.' It therefore does not impose the same obligation of timely payment on the trustee once the lease is deemed rejected pursuant to § 365(d)(4).")

 Accordingly, leases already rejected by Almac's, including those rejected as a result of nonpayment of taxes under our Order of March 18, 1994, are not entitled to immediate administrative claim treatment under § 365(d)(3) for the post-petition, prerejection period. Instead, such landlords should follow the requirements of § 503(b)(1) to obtain allowance of an administrative expense claim, the payment of which will, in all likelihood, be deferred until the proposed distribution for such class of creditors is ascertainable. If, however, as was the case in *In re Narragansett Clothing Co.*, 119 B.R. 388, the Debtor refuses to meet its obligations under unrejected leases, notwithstanding our Order requiring it to do so, in that circumstance (and assuming the lessor was required to file a motion to compel such payment), we would require immediate payment in accordance with § 365(d)(3), plus possible sanctions.

The above findings of fact, conclusions of law and rulings, our Order of March 18, 1994, and our Clarification Order of April 11, 1994, are all incorporated herein by reference.

Enter Judgment consistent with this opinion.