In re DUCKWALL–ALCO STORES,
INC., Debtor.

INLAND'S MONTHLY INCOME
FUND, L.P., Appellant,

v.

DUCKWALL–ALCO STORES,
INC., Appellee.

Bankruptcy No. 89–40642–11.
Civ. A. No. 91–4080–DES.

United States District Court,
D. Kansas.

Feb. 10, 1993.

John V. Donner, Stinson, Mag & Fizzell, Overland Park, KS, for debtor, appellee.

Robert L. Baer, Cosgrove, Webb & Oman, Lauren M. Lowry, Woner, Glenn, Reeder, Lowry & Girard, Topeka, KS, for appellant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before this court on an appeal taken by Inland's Monthly Income Fund, L.P., ("Inland") from the order of the bankruptcy court denying in part its demand pursuant to 11 U.S.C. § 365(d)(3) for payment from the bankruptcy estate of Duckwall–ALCO Stores, Inc. ("Duckwall").[1] Duckwall rejected an unexpired lease of commercial real estate owned by Inland. The amounts claimed are alleged to have been obligations under the lease during the period following the order for relief and prior to the date of rejection.

The appellant raises two issues in this appeal. First, Inland disputes the bankruptcy court's determination of the date Duckwall rejected its nonresidential property lease with Inland. Second, Inland argues that under 11 U.S.C. § 365(d)(3), based on the terms of the lease, it is enti-

tled to payment for property taxes on the real estate that accrued before the date the bankruptcy petition was filed, but were not payable until June 1, 1989, a date subsequent to the filing of the petition but prior to Duckwall's rejection of the lease.

### Facts

The essential facts relevant to this appeal are not in dispute. In 1985, Duckwall executed a ten-year lease for retail store space with Inland's predecessor-in-interest. The leased space, located in a shopping center in McHenry, Illinois, was adjacent to property leased by another tenant, a savings and loan association. Duckwall's lease was expressly subject to the lease with the savings and loan association. The two tenants shared common areas such as the parking lot, driveways, and sidewalks.

The lease provided for guaranteed monthly rent payments of $14,784.79, to be paid in advance between the first and fifth of each month.[2] Commonly known as a "triple-net" lease, it also obligated the tenant to pay taxes and assessments; insurance premiums; and the cost of repairs, replacements, and maintenance of the premises; each in accordance with specific provisions of the lease. The section regarding taxes reads in pertinent part as follows:

> 24. As additional rental, the Tenant agrees to pay to the Landlord, *when due,* the amount of all taxes and assessments levied and assessed against the premises *and that shall become due and payable during the original or any renewed term thereof.* Provided, however, that for any partial tax year occurring during the original or any renewed term hereof, the Tenant shall be liable for only that proportion of such taxes and assessments as the number of days in such partial tax year bears to 365, based upon the last available assessment and levy.

---

**1.** This court has jurisdiction pursuant to 28 U.S.C. § 158(a).

**2.** In addition, the lease required Duckwall to pay an annual "percentage rental" based on a

percentage of gross annual sales in excess of a fixed sum. However, the parties have stipulated that no percentage rental accrued during the period of time pertinent to this appeal.

Tenant may take the benefit of the provisions of any statute or ordinance permitting any assessment to be paid over a period of years, and *Tenant shall be obligated to pay only those installments falling due during the term of this Lease.*

(Emphasis added.)

In Illinois, property taxes are assessed on a calendar year basis, but are not billed to the taxpayer until the following spring. Taxpayers have the option of paying the entire tax liability for the previous calendar year on or before June 1, or paying in two equal installments on or before June 1 and September 1 respectively. The second installment is considered delinquent after September 1. Prior to 1989, Inland paid the property taxes in installments and billed Duckwall for reimbursement of its proportionate share of each half after it was paid.[3]

Under the lease, Duckwall reserved the right to remove movable trade fixtures installed on the premises, provided that Duckwall repair any damage caused by their removal. The lease expressly acknowledged that Duckwall intended to lease its trade fixtures and equipment for use on the premises. Duckwall leased such fixtures and equipment from Manufacturer Hanover Leasing Corporation ("MHLC") under a separate agreement.

On May 8, 1989, Duckwall, whose principal place of business is in Kansas, filed a voluntary petition in the United States Bankruptcy Court for the District of Kansas, seeking relief under Chapter 11 of the Bankruptcy Code. By stipulation, the date of the order for relief was also May 8, 1989. *See* 11 U.S.C. § 301. At the time the petition was filed, Duckwall was current on its lease payments to Inland and was not in default in any way.

Duckwall notified Inland in June 1989 of its intent to reject its unexpired lease in accordance with 11 U.S.C. § 365(d)(3). On June 27, 1989, Duckwall notified MHLC by letter of its intent to close the store in McHenry and requested that it remove the leased fixtures from the store between July 6 and July 15.[4]

On July 7, 1989, Duckwall notified Inland by telephone that it had closed its store, but it could not return possession of the premises until July 15 because the leased fixtures had not yet been removed from the premises.

In a letter dated July 17, 1989, and received by Inland the next day, Duckwall notified Inland that it had vacated the premises. With the letter Duckwall returned the keys to the store, and included a check for $14,707.05, representing payment of rent prorated for the period July 1 through July 18 ($8,584.72) and taxes prorated for the period from May 8, 1989, through July 18, 1989, ($6,122.33).[5] In addition, Duckwall's letter notified Inland that MHLC had been advised to remove the fixtures in the store, and any questions concerning the fixtures should be addressed to MHLC. The letter listed the names and telephone numbers of MHLC's representatives.

MHLC contacted Inland on at least two occasions in August, seeking additional time to remove the fixtures from the premises. Inland refused to grant permission, but took no action to eject MHLC or otherwise enforce its right to exclusive possession of the premises following Duckwall's departure. Ultimately, MHLC's agents obtained access to the store with a key that had been retained by the McHenry police department for security reasons, and conducted an auction of the fixtures on Inland's premises. According to Inland, it did not obtain exclusive possession of the premises prior to September 1, 1989.

---

**3.** The balance of Inland's property tax obligation for the subject real estate was billed to the adjacent savings and loan association.

**4.** The parties stipulated that Duckwall rejected the fixture lease with MHLC pursuant to the order of the bankruptcy court. *See* 11 U.S.C. § 365(a).

**5.** Absent evidence to the contrary in the record designated for appeal, the court assumes that Duckwall timely paid Inland the guaranteed monthly rent due in early June 1989.

On November 28, 1989, Inland filed proof of its general unsecured claim with the bankruptcy court pursuant to 11 U.S.C. § 502(b)(6) arising from Duckwall's rejection of the unexpired lease of nonresidential real property. On February 14, 1990, Inland filed a motion to compel Duckwall to comply with 11 U.S.C. § 365(d)(3). Inland sought immediate payment under that provision in the amount of $75,718.07, after deducting the amount of the check Duckwall sent Inland with its letter dated July 17, 1989.[6] Duckwall objected to Inland's motion, and the bankruptcy court's resolution of the dispute triggered this appeal by Inland.

### Decision of the Bankruptcy Court

The bankruptcy court determined that Duckwall rejected the lease effective July 18, 1989, on the basis of its letter to Inland dated July 17, 1989. However, the court reasoned that Duckwall should have allowed MHLC a reasonable amount of time to remove the leased fixtures after Duckwall ceased operations on the premises. The court determined that a reasonable amount of time ended on July 31, 1989, and therefore required the estate to pay rent and taxes through that date as an "administrative expense." Consequently, the bankruptcy court determined that Inland was entitled to $6,200.07 in additional monthly rent at the lease rate, prorated for

the period July 19 to July 31. Further, based on the bankruptcy court's interpretation of the lease, Inland was held entitled to payment of $1,099.93 for additional property taxes, prorating the 1988 taxes through July 31, 1989.[7]

### Scope of Review

In reviewing a decision of the bankruptcy court, findings of fact may not be set aside unless clearly erroneous. Bankruptcy Rule 8013. However, the district court considers *de novo* questions of law, as well as mixed questions of fact and law which involve "'primarily a consideration of legal principles.'" *In re Ruti-Sweetwater, Inc.,* 836 F.2d 1263, 1266 (10th Cir.1988) (citations omitted). The court also considers *de novo* the legal conclusions drawn by the bankruptcy court from the facts found. *See In re Golf Course Builders Leasing, Inc.,* 768 F.2d 1167, 1169 (10th Cir.1985). When the facts are not in dispute and the findings of fact are not challenged, as in this case, the reviewing court is concerned only with the legal conclusions to be drawn from the facts found. *Id.* (citing *Colorado Springs Nat'l Bank v. United States,* 505 F.2d 1185, 1189 (10th Cir.1974)).

### Analysis

#### I. Date of Rejection.

On appeal, Inland argues that the bankruptcy court erred in determining that July

6. The total amount claimed by Inland included insurance premiums, maintenance and repair expenses, utilities, and cleaning expenses, which were disallowed by the bankruptcy court to the extent incurred after July 31, 1989. The lower court's determinations as to these miscellaneous expenses are not specifically challenged in this appeal. However, Inland argues that if the date of rejection was September 1, 1989, as it contends, then these expenses must be paid as lease obligations together with post-petition rent and taxes.

7. The parties stipulated to the bankruptcy court that the per diem amount for prorated taxes for the period between May 8, 1989, and the date of rejection was $84.61, based on the 1988 tax assessment. Apparently the bankruptcy court granted Inland prorated taxes for the period July 19, 1989, through July 31, 1989, or 13 days at the stipulated per diem rate of $84.61, yielding $1,099.93. This amount is in addition to the

sum of $6,122.33 paid by Duckwall with its letter dated July 17, 1989.

In its appeal, Inland does not dispute the bankruptcy court's calculation of the tax liability, but rather contends that the estate is liable under § 365(d)(3) for the entire amount of 1988 taxes that Inland paid on June 1, 1989, or $31,-475.28. The parties had stipulated that taxes accruing from January 1, 1988 through December 31, 1988, amounting to $31,475.28, were additional rentals payable by Duckwall pursuant to the lease; that taxes accruing from January 1, 1989, through May 7, 1989, were additional rentals payable by Duckwall pursuant to the lease, and that taxes accruing from May 8, 1989 through the effective date of rejection were "entitled to 11 U.S.C. § 365(d)(3) treatment." This court takes no position with regard to whether the parties' stipulations to the bankruptcy court regarding Duckwall's obligations for taxes have a legal basis in the lease.

18, 1989, was the effective date of rejection for the purpose of determining Duckwall's obligations pursuant to 11 U.S.C. § 365(d)(3). Inland contends that the date of rejection was September 1, 1989. Relying on Illinois law regarding the concept of surrender of a leasehold, Inland argues that the real property was not surrendered until Inland accepted exclusive possession of the premises, after MHLC removed the fixtures Duckwall had leased for its retail store operation.

The pertinent provisions of section 365 of the Bankruptcy Code read as follows:

> (d)(3) The trustee [or debtor-in-possession][8] shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60–day period. ....
>
> (4) ... [I]n a case under any chapter of this title, if the trustee [or debtor-in-possession] does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

The bankruptcy court concluded as a matter of law that Duckwall rejected the lease effective July 18, 1989, by sending the letter on July 17 along with the keys and payment for prorated rent and taxes. Nevertheless, the court held that Duckwall was obligated to pay rent and taxes for occupancy through July 31, 1989, as an administrative expense, reasoning that the lease with MHLC was not terminated until July 18, 1989, and Duckwall should have afforded MHLC a reasonable time after that date to remove the fixtures.

■ Pursuant to 11 U.S.C. § 365(g)(1), the rejection of an unexpired lease of the debtor constitutes a breach of the lease effective immediately before the date the bankruptcy petition was filed, if the lease has not been assumed. Without the special protections of § 365(d)(3), the lessor would simply have a prepetition unsecured claim against the estate for damages resulting from termination of the unexpired lease agreement, effective with the date of filing the petition. *See* 11 U.S.C. §§ 502(b)(6), 502(g); *In re Cardinal Export Corp.*, 30 B.R. 682, 684 (Bankr.E.D.N.Y.1983).[9]

The enactment of § 365(d)(3) and (4), which became effective in 1984, provided more favorable treatment to lessors of nonresidential property by ensuring ongoing timely payment of obligations under an unexpired lease pending a determination whether to assume or reject, notwithstanding the automatic stay protections of bankruptcy. *See, e.g., In re Southwest Aircraft Services, Inc.*, 831 F.2d 848, 850–51 (9th Cir.1987) (legislative history), *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988); *In re Laurence R. Smith, Inc.*, 127 B.R. 715, 716 (Bankr. D.Conn.1991) (same); *see also* 11 U.S.C. § 362 (automatic stay). The landlord, under § 365(d)(3), has a procedure by which to compel a tenant to either make the payments due under the lease, or reject the lease and surrender the property to the landlord. *In re PCH Assoc.*, 949 F.2d 585, 591, 598 (2d Cir.1991).

---

**8.** The trustee's statutory duty also applies to a debtor-in-possession. *See* 11 U.S.C. § 1107(a).

**9.** Prior to enactment of § 365(d)(3), the lessor could also file a claim for administrative expenses under 11 U.S.C. § 503(b)(1)(A) for the "actual and necessary costs and expenses of preserving the estate." Under this language, however, the courts held that the estate was obligated only for the reasonable value of the use and occupancy of the premises pending assumption or rejection of the lease. *See, e.g., In re Cardinal Export Corp.*, 30 B.R. at 684 (citing 3 *Collier on Bankruptcy* ¶ 503.04[1][a], at 503–15 (15th ed. 1983)).

However, these subsections also impose a durational limit of 60 days on the time permitted the trustee or debtor-in-possession to decide whether to assume or reject an unexpired lease, unless the court, for cause and within such 60–day period, permits additional claims. *See* 11 U.S.C. § 365(d)(4); *In re Elm Inn, Inc.*, 942 F.2d 630, 633 (9th Cir.1991); *In re Western Monetary Consultants*, 100 B.R. 545, 547 (Bankr.D.Colo.1989). Pending the decision to assume or reject, the trustee or debtor-in-possession is generally required to timely perform all lease obligations arising after the order for relief until the date of assumption or rejection.[10] While the court for cause may extend the time for performance of any such obligation *arising within* the 60 day period, it may not extend the time for performance of such obligations beyond 60 days from the date of the order for relief. *See* 11 U.S.C. § 365(d)(3); *In re Western Monetary Consultants*, 100 B.R. at 547.

Inland argues that Duckwall is liable for payment of its lease obligations until September 1, 1989, since it did not surrender the premises before that date. "Surrender" is a legal term of art in the law of landlord-tenant relations. The term refers to the tenant's release from lease obligations prior to the end of the lease term, in exchange for the tenant's voluntary return or "surrender" of the leased premises. *See In re McLean Enterprises, Inc.*, 105 B.R. 928, 932 (Bankr.W.D.Mo. 1989) (citing Minnesota law); *see also Black's Law Dictionary* 1444 (6th ed. 1990). The bankruptcy court below correctly held that the state law doctrine of "surrender" is preempted by the Bankruptcy Code, to the extent the two are inconsistent. *See In re McLean*, 105 B.R. at 932 (citing *In re Spats Restaurant & Saloon*, 64 B.R. 442, 447 (Bankr.D.Nev.1986)). Contrary to Inland's contention, Duckwall's rejection of the unexpired lease was not conditioned upon Inland's acceptance of the premises. Rather, the language of the Code envisions a unilateral decision on the part of the trustee or debtor-in-possession whether to reject or assume the unexpired lease, subject only to the court's approval.[11]

---

10. Although these payments have been characterized by many courts, including the court below, as "administrative expenses," this court cannot agree. Lease obligations under § 365(d)(3) are not subject to requirements of § 503 for payment of administrative expenses. *See, e.g., In re Paul Harris Stores, Inc.*, 148 B.R. 307, 312 (S.D.Ind.1992) (lessor need not show post-petition rent is actual and necessary for preserving estate); *In re Telesphere Communications, Inc.*, 148 B.R. 525, 530, 531 n. 4 (Bankr. N.D.Ill.1992) (§ 365(d)(3) requires payment without application and without court review); *In re Western Monetary Consultants*, 100 B.R. at 547 (rent payments during first 60 days post-petition are allowed at contractual rate, without notice and hearing, and no showing of reasonableness need be made); *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y.1986) (§ 365(d)(3) obligation is expressly independent of normal standards for administrative expense claims). Further, the courts have generally interpreted § 365(d)(3) to require the trustee or debtor-in-possession to pay the lease obligations to the landlord immediately, at least if it appears that the assets of the estate are sufficient to pay all other administrative claims. *See, e.g., In re Orvco, Inc.*, 95 B.R. 724, 728 (9th Cir.BAP 1989). *But see In re Telesphere Communications, Inc.*, 148 B.R. at 527–30 (finding no support in the statute or the legislative history of § 365(d)(3) for the interpretation by the majority of courts that lease

obligations need not be timely paid if it appears assets of bankrupt are insufficient to pay all administrative claimants). This court is in full agreement with the courts that have held, based on the clear language of § 365(d)(3), that it creates obligations with priority over § 503 administrative claims. As the court in *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. at 883, so eloquently put it:

> The command of Section 365(d)(3) is clear and unambiguous. It means exactly what it says. We decline the ... invitation to disfigure with the patina of judge made law the clean surface of a statute.

*See also In re Telesphere Communications, Inc.*, 148 B.R. at 528 n. 6. Lease obligations payable under § 365(d)(3) are distinct from § 503 administrative expenses and constitute a unique category under the Bankruptcy Code.

11. However, § 365(a) is expressly subject to § 365(d)(4), which provides that an unexpired lease of nonresidential real property is deemed rejected if it is not assumed or rejected within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes. Hence, the lease is rejected by operation of law 60 days after the petition is filed, unless it is rejected sooner with the approval of the court or unless it is assumed with the approval of the court. *See Sea Harvest Corp. v. Riviera Land Co.*, 868

*See* 11 U.S.C. § 365(a); *In re By–Rite Distrib., Inc.*, 55 B.R. 740, 742 (D.Utah 1985) (§ 365 contemplates two distinct actions, one by the trustee or debtor-in-possession and one by the court). Upon rejection, § 365(d)(4) requires the trustee or debtor-in-possession to "immediately surrender" the property to the lessor. The Code does not require the lessor to accept the premises in return before a rejection is deemed effective.

Inland contends, however, that the order of the bankruptcy court approving rejection of Inland's lease set the effective date of rejection as the date of surrender, or no later than September 1, 1989. Hence, Inland argues that even if the Code itself does not incorporate the surrender doctrine, the court itself did so by virtue of the language of its order.

The bankruptcy court entered three different orders relevant to Duckwall's intended rejection of the Inland lease. The first order, apparently drafted by Duckwall's counsel, was issued on July 19, 1989. It ordered that numerous specified leases, including Inland's, were rejected effective as of the earlier of the date of surrender of the premises by the debtor, or August 1, 1989. The second order, drafted by Inland's counsel, was issued on July 24, 1989. The second order referred specifically to the Inland lease, ordering it rejected as of the earlier of the date of surrender of the premises by the debtor, or August 1, 1989. The second order also explicitly defined the term "surrender" to include several requirements, including the return of all keys, payment of all rentals accruing to the date of surrender, and the clearing and cleaning of the premises and adjacent parking lot of all property of the debtor and third parties caused to be located there by the debtor. Finally, on October 24, 1989, long after the premises were vacated by both Duckwall and MHLC, the court issued a third "clarifying order," drafted by agreement of the parties, ordering the Inland lease rejected effective as of the earlier of (1) the date of surrender of the premises by the debtor (without defining the term "surrender"); (2) August 1, 1989, provided that if the premises were not surrendered by August 1, 1989, rejection shall be effective as of surrender; or (3) September 1, 1989.

▮ The time limit for assumption or rejection of an unexpired nonresidential lease is fixed by 11 U.S.C. § 365(d)(4) at 60 days after the order for relief, or within such additional time as the court, for cause, fixes *within such 60–day period.* To the extent that any of the three orders of the bankruptcy court purported to extend the period for rejection to alternative dates, all of which were beyond the 60–day period, they were invalid. The earliest of the three orders was issued July 19, 1989, 12 days after the end of the 60–day time period during which the court had the statutory authority to extend the period for cause.[12] *See Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1080–81 (9th Cir.1989) (bankruptcy courts not empowered to issue orders that defeat rather than carry out explicit provisions of the Bankruptcy Code such as section 365(d)(4)).

▮ Under § 365(d)(4), if the trustee or debtor-in-possession does not assume or reject an unexpired lease of nonresidential real property within 60 days after the date of the order for relief (in this case, May 8, 1989), the lease is deemed rejected on the date the 60–day period expires. Although Duckwall filed its motion for rejection of the Inland lease, among others, on June 14, 1989, the bankruptcy court failed to act on the motion within the 60–day limit.[13]

F.2d 1077, 1079 (9th Cir.1989) (legislation protects bankrupt estate from unexpected liability through statutory presumption of rejection, unless trustee or debtor in possession acts affirmatively to bring unexpired lease into estate).

12. Even if one or more of the orders had been entered within the 60–day period, none of the orders indicates that the bankruptcy court determined that cause existed for extending the time period beyond 60 days. *See* 11 U.S.C. § 365(d)(4) (bankruptcy court may fix additional time beyond 60 days for cause).

13. Had Duckwall sought immediate rejection of the Inland lease, it might seem harsh to hold the debtor-in-possession liable for lease obligations until expiration of the 60–day period, pending action by the court on the motion to reject. However, the party seeking relief in any court

Therefore, the unexpired lease was deemed rejected upon the lapse of the 60–day period from the date of the order for relief, or July 7, 1989. *See In re Arizona Appetito's Stores, Inc.*, 893 F.2d 216, 219–220 (9th Cir.1990) (when debtor files motion to reject lease within 60 days, lease is deemed rejected at the end of the sixty days, without the need for court approval); *In re Paul Harris Stores, Inc.*, 148 B.R. 307, 310 (S.D.Ind.1992) (§ 365(d)(4) provides a lease is rejected by operation of law 60 days after petition filed, if not explicitly assumed or rejected within that period) (citations omitted).[14]

██ The order of the bankruptcy court awarded additional amounts to Inland on the assumption that, while the effective date of rejection was July 18, 1989, Duckwall was responsible for prorated rent and property taxes as "administrative expenses" through July 31, 1989, the date the bankruptcy court determined was a reasonable time to permit MHLC to remove the fixtures. For all practical purposes, the amount awarded below to Inland assumed that Duckwall was responsible under the lease for rent, including tax payments characterized under the lease as "additional rents," through July 31, 1989. However, the actual date of rejection, as a matter of law, was July 7, 1989, 60 days following the order for relief. Inland is therefore entitled to payment under 11 U.S.C. § 365(d)(3) only for lease obligations arising between May 8, 1989, the date of the order for relief, and July 7, 1989, the date of rejection. Although Inland may have a claim against the estate for damages as a result of breach of the lease, *see* 11 U.S.C. §§ 501(a), 502(a), 502(b)(6), or an administrative claim under 11 U.S.C. § 503(b), any such claims are not entitled to the special protections afforded commercial lessors by § 365(d)(3).[15]

must bear the risk that the court may not reach a decision as quickly as the party expected or desired. *In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 815 (S.D.Ohio 1991), *quoted in In re Paul Harris Stores, Inc.*, 148 B.R. 307, 310, 311 (S.D.Ind.1992). This court is not presented with the question whether Duckwall's motion to reject, filed on June 14, 1989, constituted rejection as of that date, because the motion itself sought approval for rejection as of the earlier of the date of surrender of the premises or August 1, 1989. Duckwall does not contend that it surrendered the premises prior to July 7, 1989, when the 60–day post-petition period expired.

**14.** The court acknowledges the stipulation of the parties before the bankruptcy court to the effect that the date of rejection, although in dispute, was sometime after July 17, 1989. However, since the unexpired lease was rejected as a matter of law pursuant to § 365(d)(4) effective 60 days after Duckwall filed its bankruptcy petition, the parties' stipulation has no legal effect.

The court recognizes that some courts have held that the 60–day limit does not preclude the bankruptcy court from entering a subsequent order approving a motion to assume an unexpired lease, or a motion for an extension of time to decide whether to assume or reject. *See, e.g., In re Southwest Aircraft Services, Inc.*, 831 F.2d 848, 853 (9th Cir.1987). However, neither a motion to assume nor a motion for extension of time was filed in this case. Rather, the parties simply assumed in submitting their proposed orders that the court had the authority to approve a rejection date beyond the 60–day statutory limit, an assumption implicitly adopted by the bankruptcy court. None of the bankruptcy court's orders sets forth any findings that could be construed as a determination that cause existed for extending the time for rejection beyond July 7, 1989, when the 60–day period expired. *Compare In re Paul Harris Stores*, 148 B.R. at 308 n. 4 (debtor timely filed two motions for extension of time before ultimately rejecting lease).

**15.** The court acknowledges that the bankruptcy court's judgment characterized the amounts awarded as "administrative expenses," without specifying whether they were allowed under § 365(d)(3) or § 503(b). The Bankruptcy Code distinguishes between lease obligations within the 60–day post-petition period and administrative expenses under § 503(b). *See, e.g., In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415, 416 (D.Mass.1987) (distinguishing claim for rent under § 365(d)(3) from other administrative claims under 11 U.S.C. § 503(b)(1)); *In re Fisher & Fisher, Inc.*, 51 B.R. 680, 682 (Bankr. S.D.Ohio 1985) (lessor's claim for post-rejection occupancy limited to actual and necessary costs of preserving the estate; court not bound by rental agreement since it was no longer in effect post-rejection). Under the latter provision, certain types of expenses are to be allowed by the bankruptcy court following notice and a hearing, upon the filing of a request for such payment. *See* 11 U.S.C. § 503(a).

The record designated for appeal does not include a request for administrative expenses pursuant to 11 U.S.C. § 503(a). The motion and proof of claim submitted by Inland to the bankruptcy court sought payment under § 365(d)

**974**

Duckwall's payment to Inland with its letter dated July 17, 1989, included $8,584.72 for rent prorated for the period July 1 through July 18, 1989. The parties stipulated that the monthly rental obligation should be prorated on the basis of the actual number of days in the month.[16] On remand, the bankruptcy court shall determine the amount of monthly rent under the lease to which Inland is entitled under § 365(d)(3) on the basis of the rejection date of July 7, 1989.

## II. *Lease Obligation to Pay Property Taxes.*

Inland contends it is entitled to payment under § 365(d)(3) for the entire amount of real estate property taxes that accrued during calendar year 1988, and which became due and payable under Illinois law after Duckwall filed for bankruptcy but before the date of rejection.[17] For the following reasons, this court has determined that Duckwall is obligated to pay one-half of the property taxes for 1988, which were due on June 1, 1989, a date which fell within the post-petition period prior to the date of rejection.

Section 365(d)(3) requires the trustee or debtor-in-possession to "timely perform all the obligations ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected...." With regard to taxes, the lease explicitly provided, "Tenant shall be obligated to pay only those installments falling due during the term of this Lease."[18] Under Illinois law, taxes on real property are payable in two equal installments. Ill.Rev.Stat. ch. 120 ¶ 675, § 194(a). A representative of Inland testified at the hearing before the

bankruptcy court that the lessor's practice in the past had been to pay the taxes in installments, and then bill the lessees for reimbursement of their proportionate shares.

The term "due" may have various meanings depending upon the context in which it is used. *See In re Vause*, 886 F.2d 794, 800 (6th Cir.1989) (interpreting "due" as used in § 502(b)(6)(B)). In this case, the extent of Duckwall's lease obligations payable pursuant to § 365(d)(3) depends upon the meaning of the term "due" as used in the lease provision pertaining to the payment of taxes as additional rent. Construction of an unambiguous written contract is an issue of law. *E.g., Rhoads v. Clifton, Gunderson & Co.*, 89 Ill.App.3d 751, 44 Ill.Dec. 914, 918, 411 N.E.2d 1380, 1384 (1980). If the terms of an agreement are ambiguous, the court may look to the contracting parties' own conduct in order to determine their understanding of the agreement. *National Diamond Syndicate, Inc. v. UPS*, 897 F.2d 253, 261 (7th Cir.1990) (citing Illinois cases).

It is undisputed that prior to 1989, when Duckwall filed for bankruptcy, Inland paid the property taxes in installments and billed Duckwall for reimbursement of each installment. Further, the meaning of the term "due" as used in the lease must be construed in a manner consistent with the language allowing the tenant the option of paying taxes in installments. It would be incongruous to hold that because the landlord, as taxpayer, elected to pay the entire tax bill in a single payment, the tenant thereby lost the option under the lease to pay only the installments falling due during the lease term. The court therefore concludes that the parties them-

and § 502(b)(6) respectively. Therefore, whether or not Inland may be entitled to claim administrative expenses pursuant to 11 U.S.C. § 503(b) is not an issue before this court. The court therefore takes no position as to any part of the bankruptcy court's decision which may have implicitly relied upon § 503.

Nor is this court asked to decide the extent, if any, of Inland's general unsecured claim for post-rejection unpaid rents pursuant to 11 U.S.C. § 502(b)(6). *See In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 814 (S.D.Ohio 1991).

**16.** Whether or not the stipulated proration of the monthly rent obligation finds legal support in the lease is not before this court for review.

**17.** As the court understands Inland's argument, this court's determination on appeal that the date of rejection was July 7, 1989, rather than July 18, 1989, has no effect on the tax issue.

**18.** The language of the lease contradicts Inland's assertion that the lease did not give the right to pay in installments to the debtor/lessee.

selves interpreted the lease to require the lessee to pay taxes as additional rent only at the time each of the two equal installments came due.

It is undisputed that the first installment of 1988 property taxes was due June 1, 1989, and payment of the second installment was not required until September 1, 1989. Only the first installment was "due" prior to the date of rejection, which this court has determined as a matter of law was July 7, 1989. The court therefore concludes that Duckwall was obligated under the lease to pay the first half of the property taxes which had accrued in 1988 and which were due and payable post-petition on June 1, 1989.[19] Inland was thus entitled under § 365(d)(3) to immediate payment from Duckwall for the amount of $15,-737.64[20] for "additional rent" for reimbursement of property taxes that had accrued to Inland in 1988.[21]

The bankruptcy court prorated the 1988 accrued taxes for the period July 18 through July 31, 1989 on the reasoning that the lease provided for proration.[22] However, the proration clause in the lease applies only to "any partial tax year occurring during the original or any renewed term" of the lease. Pursuant to 11 U.S.C. § 365(g)(1), rejection of an unexpired lease constitutes a breach immediately prior to the date of filing the petition. Therefore, by operation of law the lease was retroactively terminated as of that date. *See In re Cardinal Export Corp.*, 30 B.R. 682, 684 (Bankr.E.D.N.Y.1983) (liability for rent ceased upon termination of lease by its breach). Since the lease terminated by operation of law effective May 8, 1989, the proration clause was inapplicable for the period July 19 through July 31, 1989.

Even if the lease's proration clause controlled during the period in question, the court would not agree with the bankruptcy court's interpretation. The ten-year primary term of the lease commenced on April 1, 1985, and had not yet expired when

**19.** Although Inland contends that it paid the entire 1988 tax bill on June 1, 1989, the court notes that the language of the lease is clear in allowing the *tenant* to take advantage of the statute allowing payment in installments. While the lessor as taxpayer may elect to pay the tax in one lump sum under Illinois law, the tenant's *lease obligation* is not altered by the taxpayer/lessor's election to do so. Although the lessor's 1988 tax liability for the real property accrued prepetition, the debtor's lease obligation to pay the additional rent by reimbursing Inland for the property taxes did not arise until after the petition was filed on May 8, 1989.

**20.** The parties stipulated that 1988 accrued property taxes amounted to $31,475.28. *See supra* n. 7, ¶ 2.

**21.** The court notes that the second installment on the 1988 accrued taxes was not due and payable under the lease until September 1, 1989, after the date of rejection. *Compare In re Ames Dep't Stores, Inc.*, 136 B.R. 353, 354 (Bankr. S.D.N.Y.1992) (lease required tenant to pay taxes prorata for period of occupancy regardless of when taxes were payable). Whether or not Inland has a claim against the estate under 11 U.S.C. §§ 502(b)(6) or 503(b) for payment of the second installment, or for any taxes accruing after 1988 but not due under Illinois law until after the lease was terminated, is not before this court for review. However, 11 U.S.C. § 365(g) provides that the rejection of an unexpired lease constitutes breach of the lease effective immedi-

ately before the date the bankruptcy petition was filed. As this court interprets the lease, any *lease obligation* for payment of 1988 accrued taxes terminated as of the date of rejection, July 7, 1989. A lessor's claim for holdover rent for post-rejection occupancy is not necessarily determined on the basis of the lease provisions. *See, e.g., In re Western Monetary Consultants*, 100 B.R. 545, 547 (Bankr.D.Colo.1989) (after 60 days after filing of petition, administrative claim for rent determined using objective worth standard, measuring fair and reasonable value of lease; however, rebuttable presumption exists that contractual rental rate is fair and reasonable, which may be adjusted on the basis of debtor's actual use); *In re Homeowner's Outlet Mall Exchange, Inc.*, 89 B.R. 965, 969–70 (Bankr. S.D.Fla.1988) (fair market value for space actually occupied); *In re Rare Coin Galleries*, 72 B.R. at 417.

**22.** The bankruptcy court did not order payment of prorated property taxes for the pre-petition period through May 7, 1989, despite its reasoning that the parties intended the tax obligation to accrue as the debtor occupied the premises. However, § 365(d)(3) requires performance only of obligations "arising from and after the order for relief under any unexpired lease." Apparently the bankruptcy court reasoned that property taxes accruing during the pre-petition period did not arise after the order for relief. Duckwall paid Inland prorated taxes for the post-petition period May 8, 1989 through July 17, 1989, with its letter dated July 17, 1989.

Duckwall filed its petition. The context of the proration clause indicates that the parties to the original lease intended that property taxes becoming due and payable in 1985 would be prorated on the basis of the partial calendar year of occupancy from April 1 through December 31, 1985. As this court interprets the lease, the wording of the proration clause does not apply to partial tax years created as a result of breach of the lease by the lessee. Instead, it applies only to a partial tax year occurring at the beginning of the lease term, or as a natural result of the expiration of the ten-year term or any renewal term of ten years.

The question in this case is what payments the *lease* obligated Duckwall to make to Inland during the 60 days following the filing of the petition. In enacting § 365(d)(3), Congress wanted to ensure that lessors of commercial property would have a continuing flow of lease revenue pending a decision by the trustee or debtor-in-possession whether to reject or assume the lease. To require Duckwall to pay the first installment of taxes due on June 1, 1989, is consistent with this purpose and the prior course of dealings between the parties.

Duckwall paid Inland $6,122.33 for property taxes when it sent its notice to Inland on July 17, 1989.[23] Deducting this amount from the $15,737.54 lease obligation for additional rent for the first half of the 1988 taxes, the balance owed to Inland by the estate for its lease obligations for property taxes pursuant to § 365(d)(3) is $9,615.21.[24]

IT IS BY THE COURT THEREFORE ORDERED that the judgment of the bankruptcy court is hereby modified as stated herein, and the matter is remanded for further proceedings consistent with this memorandum and order.

IT IS FURTHER ORDERED that Duckwall's prayer for costs (Doc. 8, p. 21) is hereby denied.

---

23. The court rejects Duckwall's argument that its liability is limited to taxes accruing between the date of the petition and the date of rejection. The language of § 365(d)(3) is clear in imposing the duty to comply with all *lease obligations* arising after the order for relief. The lease in this case obligated Duckwall to pay the first installment of 1988 property taxes on June 1, 1989. The lease did not provide for payment of taxes to the landlord as they accrued.

24. This figure does not take into account the bankruptcy court's order directing payment to Inland of $1,099.93 for property taxes.